## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

**LD TECHNOLOGY, LLC**,

      Plaintiff,

v.

**IMPETO MEDICAL SAS**, *et al.*,

      Defendants.

_____/

**IMPETO MEDICAL, INC.**, *et al.*,

      Counter Claimants,

v.

**ALBERT MAAREK**, *et al.*,

      Counter Defendants.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court upon the parties' request for claim construction. The Court has carefully considered the extensive briefing by the parties, pertinent portions of the record, and authorities. The Court also heard argument and received evidence at a *Markman*[1] hearing held on December 4, 2015 ("*Markman* hearing") [ECF No. 63].

### I.    BACKGROUND

#### A.  Procedural Background

Defendant/Counterclaim Plaintiff, Impeto Medical SAS and its subsidiary, Defendant/Counterclaim Plaintiff, Impeto Medical, Inc. (collectively, "Impeto") manufacture

---

[1] *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

and sell electromechanical medical devices which assess sweat dysfunction, peripheral neuropathy, autonomic neuropathy and diabetes complications, through measurement of galvanic skin response. (*See* Impeto's Answer . . . ("Impeto Answer") [ECF No. 26] ¶ 18).[2] Impeto owns three patents for these devices, including United States Patent Numbers 8,918,170 ("the '170 patent" [ECF No. 37-2]); 8,934,954 ("the '954 patent" [ECF No. 37-3]); and 8,655,443 ("the '443 patent" [ECF No. 37-4]) (collectively, "the Asserted Patents"). (*See* Impeto Answer ¶¶ 20– 22). Impeto also owns a U.S. trademark registration for the mark "Sudoscan." (*See id.* ¶ 26).

Like Impeto, Plaintiff/Counterclaim Defendant LD Technology, LLC ("LD Tech") manufactures and sells medical devices. (*See id.* ¶ 32). Counterclaim Defendant, Albert Maarek ("Maarek") is the president and owner of LD Tech. (*See id.* ¶ 33; *see also* Am. Compl. [ECF No. 20] ¶ 8). On December 23, 2014 and January 15, 2015, Impeto sent cease-and-desist letters to LD Tech and Maarek (collectively, "Counterclaim Defendants"), stating LD Tech's "Sudopath" devices infringe the Asserted Patents and Sudoscan trademark. (*See* Impeto Answer ¶¶ 46–48, 89). On January 13, 2015, LD Tech filed the instant lawsuit. (*See* Complaint for Declaratory Relief . . . ("Complaint") [ECF No. 1]). In its Amended Complaint, LD Tech seeks: (1) a declaratory judgment finding LD Tech has not infringed the Asserted Patents; (2) a declaration finding LD Tech has not interfered with Impeto's patent rights; (3) a declaratory judgment finding LD Tech has not infringed Impeto's trademark; and (4) damages for unfair competition against Impeto. (*See generally* Am. Compl.).

The Impeto Answer alleges LD Tech is not entitled to any of the relief it seeks, and asserts counterclaims against LD Tech and Maarek, including: (1) patent infringement; (2) trademark infringement under the Lanham Act, 15 U.S.C. section 1114; (3) unfair competition;

---

[2] The paragraph number references from the Impeto Answer refer to the Counterclaims portion of the pleading.

(4) false or misleading advertising; (5) violation of the Florida Deceptive and Unfair Trade Practices Act; (6) trademark infringement under Florida common law; and (7) cancellation and/or abandonment of a federal trademark application. (*See generally* Impeto Answer). LD Tech and Maarek filed an Answer and Affirmative Defenses . . . ("LD Tech Answer") [ECF No. 29], denying infringement and the other violations asserted in the Impeto Answer, and setting forth several affirmative defenses. (*See generally id.*).

The parties have identified multiple terms and phrases from the Asserted Patents that are disputed and require claim construction. To this end, Impeto filed an Opening Claim Construction Brief ("Impeto Opening") [ECF No. 37]; and Counterclaim Defendants filed an Opening Claim Construction Brief ("LD Tech Opening") [ECF No. 38]. Thereafter, Impeto filed a Responsive Claim Construction Brief ("Impeto Response") [ECF No. 47]; and Counterclaim Defendants filed a Responsive Claim Construction Brief ("LD Tech Response") [ECF No. 46].

### B. Factual Background

#### 1. The '443 and '170 Patents

The '443 Patent was issued on February 18, 2014, and relates to an application filed on February 22, 2008. (*See* '443 Patent 2). The '170 Patent, issued on December 23, 2014, is a continuation of the '443 Patent, and relates to an application filed on February 5, 2014. (*See* '170 Patent 2). The '443 and '170 Patents share essentially the same specifications, that is, the portion of the patent document that describes the manner and process of making and using the patented invention, *see* 35 U.S.C. § 112(a); but they have different claims, "the portion of the patent document that defines the scope of the patentee's rights," *Markman*, 517 U.S. at 372.

The specification[3] proposes an electrophysiological analysis system (the "System") intended for the detection of pathological conditions, which includes: (1) "a series of electrodes capable of being placed at various regions of the human body distant from one another;" (2) "an adjustable DC voltage source which, in response to the control circuit, is capable of producing successive waves of a DC voltage which varies from one wave to the other, the duration of the waves being greater than or equal to approximately 0.2 second;" (3) "a switching circuit capable of selectively connecting a pair of so-called active electrodes to the voltage source, and of connecting at least one other high-impedance electrode;" (4) "a measuring circuit capable of collecting data representative of the current in the active electrodes and of the potentials on at least some electrodes connected in high impedance, in response to the application of said waves;" and (5) "in that, from one wave to the other, the range of voltages covered by the waves is capable of causing the appearance or disappearance of electrochemical phenomena in the vicinity of the active electrodes." ('443 Patent, col. 2, ll. 12–33).

In addition to the detailed description of the invention, the specification of the '443 and '170 Patents includes several figures demonstrating the inner-workings and various applications of the patented inventions. The '443 Patent includes four figures demonstrating: the various functional elements of the System (*see id.* at Fig. 1); the equivalent circuit diagram of the System when the electrodes are connected at various locations on the human body (*see id.* at Fig. 2); screen images produced by a data processing system associated with the System (*see id.* at Fig. 3); and tables of reference data sets used to diagnose patients (*see id.* at Fig. 4). (*See also id.* at col. 4, ll. 1–11 (describing the figures)). The '170 Patent includes six figures, the first four of

---

[3] With regard to the '443 and '170 Patents, reference to "the specification" will be a reference to the patents' shared specification. Unless citing particularly to the '170 Patent, which will be so indicated, the Court will use the column and line numbers of the '443 Patent specification.

which replicate those in the '443 Patent.  (*See* '170 Patent, Figs. 1–4).  The last two figures include tables showing abbreviations used throughout the '170 Patent.  (*See id.* at Figs. 5–6).

The '443 Patent concludes with 23 claims, articulating the scope of Impeto's rights.  (*See* '443 Patent, cols. 11–14).  For example, Claim 2 of the '443 Patent states the System comprises "a processing device designed to analyze a reciprocal evolution of the current and the potentials based on the wave voltage, and to compare the evolution with at least one reference evolution." (*Id.* at col. 12, ll. 22–26).  Claim 9 articulates the System further comprises "an offset voltage-compensating circuit . . . ."  (*Id.* at col. 12, ll. 50–56 (alteration added)).  Claim 19 describes a method for using the System to diagnose patients, by "receiving a set of data . . . ; accessing at least one set of stored reference data comprising measurements revealing electrochemical phenomena, which were obtained under the same conditions, on patients identified as suffering or not suffering from this disease; and reconciling the set of data received with the sets of reference data, and, based on proximity criteria between the set of data received and the sets of reference data, identifying the patient as ill or not ill . . . ."  (*Id.* at col. 13, l. 28–col. 14, l. 7 (alterations added)).

Similarly, the '170 Patent concludes with 19 claims.  (*See* '170 Patent, cols. 11–13).  For example, Claim 1 states the System comprises a computer "operably determining if a patient disorder is present using variation information regarding pH . . . or using variation information regarding a concentration of chlorides . . . ."  (*Id.* at col. 11, ll. 20–39 (alterations added)).  Claim 9 explains "the computer compares data detected by the electrodes in real-time with stored data . . . ."  (*Id.* at col. 11, ll. 62–63 (alteration added)).

### 2.  The '954 Patent

The '954 Patent was issued on January 13, 2015, and relates to an application filed on August 23, 2011.  (*See* '954 Patent 2).  Impeto asserts it is an improvement on the '443 and '170 Patents.  (*See* Impeto Opening 2).  The '954 Patent involves a system for assessing the sudomotor function of a patient through reverse iontophoresis.  (*See* '954 Patent, col. 2, ll. 60–61).

The specification of the '954 Patent includes five figures demonstrating the inner-workings and various applications of the patented invention.  These figures demonstrate: the system designed to carry out the method according to the invention (*see id.* at Fig.1); the main steps carried out in the diagnosis method (*see id.* at Fig. 2); a schematic representation of an eccrine gland that transports the DC current in the electrolyte (sweat) (*see id.* at Fig. 3); the results of statistical analyses carried out with the invention's method (*see id.* at Fig. 4); and comparison of clinical, biochemical characteristics and conductance measurements in patients with particular conditions (*see id.* at Fig. 5).  (*See also id.* at col. 2, ll. 39–53).  The '954 Patent concludes with 14 claims, articulating the scope of Impeto's rights.  (*See id.* at col. 6, l. 65–col. 8, l. 36).

## II.    LEGAL FRAMEWORK

### A.  General Principles of Claim Construction

The construction of a patent is a matter of law to be determined by the Court.  *See Markman*, 517 U.S. at 372.  And "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (alteration added; citation omitted).  "[I]n interpreting an asserted claim, the court should look first to the intrinsic

evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (alteration added).  "[I]ntrinsic evidence is the most significant source of the legally operative meaning of the disputed claim language." *Id.* (alteration added).

In construing patent claims, the Court first looks to the claim language, because "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  "[W]ords of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted; alteration added).  The presumption that words have their ordinary and customary meaning when used in a patent claim is rebutted where the patentee, acting as his own or her own "lexicographer," has clearly stated in the patent specification or file history a definition of a claim term that is different from the term's ordinary and customary meaning.  *See Vitronics Corp.*, 90 F.3d at 1582; *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention with reasonable clarity, deliberateness, and precision." (citations and internal quotation marks omitted; alteration added)).  A patentee may otherwise demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term, in the specification or prosecution history, by using expressions of "manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc.*, 299 F.3d at 1325.

In addition to the claims themselves, the Court should consider "the appropriate context in which the claim term is used." *Aventis Pharms. Inc.*, 715 F.3d at 1373.  So, for example,

"[t]he written description and other parts of the specification . . . may shed contextual light on the plain and ordinary meaning," unless, again, the inventor acted as his own lexicographer or disclaimed or disavowed the claim scope. *Id.* (citation omitted; alteration added). The specification is generally considered "the single best guide to the meaning of a disputed term" and "[u]sually, [] is dispositive." *Vitronics Corp.*, 90 F.3d at 1582 (alterations added). Nevertheless, the Federal Circuit has repeatedly warned against importing limitations from the specifications into the claims. *See, e.g., Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. . . . In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." (internal citations omitted; alterations added)). Likewise, "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Teleflex, Inc.*, 299 F.3d at 1326 (citation and internal quotation marks omitted; alteration added).

If presented, another piece of intrinsic evidence a Court may consider in claim construction is the patent's prosecution history — a record of the proceedings before the Patent and Trademark Office ("PTO"), including the prior art cited during the examination of the patent. *See Phillips*, 415 F.3d at 1317. Although "it often lacks the clarity of the specification" because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," the "prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.*

A court engaging in claim construction may rely on evidence external to the patent, including dictionaries, learned treatises, and expert and inventor testimony. *See id.* Such

extrinsic evidence "can shed useful light on the relevant art," but is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (citations and internal quotation marks omitted). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp.*, 90 F.3d at 1583.

**B. Indefiniteness**

The specification of a patent is required to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b).[4] "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Serv., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citation omitted). "A claim that is amenable to construction is not invalid on the ground of indefiniteness." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006); *see also Halliburton Energy Serv., Inc.*, 514 F.3d at 1249 ("[C]laims are not indefinite merely because they present a difficult task of claim construction." (alteration added)).

Rather, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). To succeed on a defense of indefiniteness, an accused infringer must show "by clear and convincing evidence that a skilled artisan could not

---

[4] Cases filed before September 16, 2012 refer to 35 U.S.C. section 112(b) as 35 U.S.C. section 112, paragraph 2. Paragraph two of 35 U.S.C. section 112 was replaced with newly designated section 112(b) when section 4(c) of the Leahy-Smith America Invents Act, Pub. L. No. 112-29 took effect.

discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Serv., Inc.*, 514 F.3d at 1249–50.  "Indefiniteness is a legal determination; if the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) (quoting *Freeny v. Apple Inc.,* No. 2:13-CV-00361-WCB, 2014 WL 4294505, at *4 (E.D. Tex. Aug. 28, 2014)), *cert. denied*, No. 15-561, 2015 WL 7692753 (U.S. Nov. 30, 2015).

### III.    CLAIM CONSTRUCTION

The parties dispute the following terms or categories of terms in the Asserted Patents: (1) "variable voltage" terms; (2) "high impedance electrodes;" (3) "measuring high impedance potential" terms; (4) "reference data" and "comparison to reference data" terms; (5) "pH/chlorides" terms; (6) "real-time comparison" terms; (7) "offset voltage compensating circuit;" (8) "electrode pair" terms; and (9) "reciprocal evolution."  The parties disputed several additional terms in their briefing; however, these terms were resolved at the *Markman* hearing.[5]

### A.  "Variable Voltage" Terms

The parties dispute a long list of terms from all three Asserted Patents regarding "variable voltage."  The crux of the parties' dispute is whether the voltage produced by the adjustable DC voltage source in the Asserted Patents should be construed to vary solely by magnitude, or also by duration, polarity, and on/off.  (*See generally* Impeto Opening; LD Tech Resp.).  The relevant claims for this construction are as follows, with the disputed terms in bold and underlined:

---

[5] At the *Markman* hearing, the Court ruled the following terms would be construed according to their plain and ordinary meaning: (1) "computer;" (2) "diagnose;" (3) "calibration circuit;" and (4) "reverse iontophoresis."

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

'443 Patent, Claim 1: "**an adjustable DC voltage source controlled in order to produce successive waves of a DC voltage which varies from one wave to the other**, a duration of the waves being greater than or equal to approximately 0.2 second"

('443 Patent, col. 12, ll. 3–6).

'443 Patent, Claims 1, 22: "in that, from one wave to the other, **the range of voltages covered by the waves** is capable of causing the appearance or disappearance of electrochemical phenomena"

(*Id.* at col. 12, ll. 14–17; *id.* at col. 14, ll. 27–29).

'443 Patent, Claim 19: "in response to the application of **voltage waves** between active electrodes, **the level of which varies from one wave to the other**, in order to cause the appearance or disappearance of electrochemical phenomena"

(*Id.* at col. 14, ll. 10–14).

'170 Patent, Claim 1: "**a direct current voltage source controlled by the computer**, the computer causing polarity to switch between the electrodes"

('170 Patent, col. 11, ll. 28–30).

'954 Patent, Claim 1: "**an adjustable DC source, which is controlled** in order to feed the anode with a DC current"

('954 Patent, col. 7, ll. 3–4).

'954 Patent, Claim 1: "**applying DC voltage pulses of varying voltage values** in order to stress sweat glands, the voltage pulses lasting given durations allowing the stabilization of electrochemical phenomena in the body"

(*Id.* at col. 7, ll. 6–9).

'954 Patent, Claim 1: "**the different DC voltages**"

(*Id.* at col. 7, ll. 13–14).

'954 Patent, Claim 3: "The method according to claim 1, wherein **the voltage values of the pulses** are lower than 10V"

(*Id.* at col. 7, ll. 27–28).

'954 Patent, Claim 7: "The method according to claim 1, wherein the computation step comprises the computation of electrochemical skin conductance values **at**

**given voltages**, by computing the ratio between the current generated through the anode and the cathode, and the resulting voltage drop between anode and cathode"

(*Id.* at col. 7, l. 36–col. 8, l. 4).

'954 Patent, Claim 8: "The method according to claim[] 7, wherein the reconciling step comprises comparing the electrochemical skin conductance values of the patient **at given voltages** to predetermined thresholds"

(*Id.* at col. 8, ll. 5–8 (alteration added)).

Impeto argues the voltage produced by the adjustable DC source in the Asserted Patents should be construed to vary in "any manner such as by voltage magnitude, duration, polarity (i.e. positive to negative, or negative to positive), or on/off or off/on." (Impeto Opening 13). Impeto argues this proposed construction is consistent with the claims' language and is also supported by the specifications of the Asserted Patents. (*See id.* 13–24). For example, Impeto points to the specification of the '443 Patent that describes the voltage waves, stating, "[t]he voltage waves have a voltage value of between approximately 1 and 4 volts and a duration of between approximately 0.5 and 5 seconds . . . The switching circuit is capable of connecting a single pair of electrodes to the voltage source in two reversed polarities." (*Id.* 15–16 (quoting '443 Patent, col. 2, l. 63–col. 3, l. 9 (alterations added))).

Impeto further argues several of the dependent claims of the '443 Patent give examples of the ways in which the voltage waves may vary, including by direction (Claim 11); magnitude (Claims 12 and 13); duration (Claim 14); and polarity (Claims 15 and 18). (*See id.* 16–17).[6] It

---

[6] Claim 11 of the '443 Patent states "wherein the system is designed to vary the voltage of the successive waves in one direction and then in the other." ('443 Patent, col. 12, ll. 61–63). Claim 12 states "wherein the system is designed to vary the voltage of the successive waves by a first step and then by a second step, which is smaller than the first." (*Id.* at col. 12, ll. 64–67). Claim 13 states "wherein the voltage of the successive waves varies by steps of between approximately 0.05 and 1 volt." (*Id.* at col. 13, ll. 1–3). Claim 14 states "wherein the successive waves are spaced apart by a duration of between approximately 0.5 and 5 seconds." (*Id.* at col. 13, ll. 4–6). Claim 15 states "wherein the switching circuit is designed to connect a single pair of electrodes to the voltage source in two reversed polarities." (*Id.* at col. 13, ll. 7–

argues the "adjustable DC source" of independent Claim 1 must be broad enough to account for all these different variations listed in the dependent claims, as 35 U.S.C. section 112 provides that dependent claims further narrow independent claims.   (*See id.* 16).  Finally, Impeto asserts its proposed construction is supported by definitions provided in technical dictionaries and laymen dictionaries.  (*See id.* 17).

LD Tech proposes the "variable voltage" terms be construed to vary solely by magnitude. (*See*, *e.g.*, LD Tech Resp. 13).  According to LD Tech, Impeto is attempting to improperly broaden the construction of the "variable voltage" terms, even to construe sources as "adjustable" simply because they can turn on or off.  (*See id.* 6).  In support of its proposed construction, LD Tech cites many of the same claims and specifications as Impeto, but points out that the patent language explicitly separates the references to polarity, duration, and direction, from the references to magnitude; indicating the polarity, duration, and direction variations are possible independent features, while the voltages produced by the adjustable DC source *must* vary by magnitude.  (*See*, *e.g.*, *id.* 13–15).

For example, Claim 1 of the '443 Patent explicitly separates "duration of the waves" from "voltage which varies," indicating the latter does not incorporate the former.  (*See* '443 Patent, col. 12, ll. 3–6 (stating "an adjustable DC voltage source controlled in order to produce successive *waves of a DC voltage which varies* from one wave to the other, *a duration of the waves* being greater than or equal to approximately 0.2 second" (emphases added))). Furthermore, some of the claim and specification language refers to the "value" of the voltage, and the surrounding text clearly indicates "value" includes only the magnitude of the voltage, as opposed to the duration or polarity.  (*See*, *e.g.*, '954 Patent, col. 7, ll. 27–28 ("The method

---

9).  Claim 18 states "wherein after having connected a certain pair of electrodes to the voltage source with a certain polarity, the switching circuit is designed to connect this same pair of electrodes to the voltage source with a reversed polarity . . . ."  (*Id.* at col. 13, ll. 22–26 (alteration added)).

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

according to claim 1, wherein the *voltage values of the pulses are lower than 10V*." (emphasis added)); *see also* '443 Patent, col. 2, ll. 63–65 ("The voltage waves have a *voltage value of between approximately 1 and 4 volts* and a duration of between approximately 0.5 and 5 seconds." (emphasis added))).    Thus, LD Tech argues the claims and specifications of the Asserted Patents are clear that variability of the voltage magnitude and variability, if any, of the duration or polarity of the waves are independent features of the inventions.  (*See* LD Tech Resp. 14–15).

With respect to the aforementioned dependent claims of the '443 Patent (Claims 11–15, 18, discussing duration, direction, and polarity), LD Tech argues these claims simply set forth possible independent features of the voltage waves but are not meant to alter the inherent meaning of "variable voltage" as produced by the adjustable DC voltage source.   (*See id.*).   LD Tech also asserts the direction variation is actually just a manifestation of magnitude variation. (*See id.* 14 (explaining that varying voltage "in one direction, then the other" means the voltage must be increased and then decreased between waves, or *vice versa*)).   Finally, LD Tech contends the polarity switch between the electrodes, as addressed in Claim 15 of the '443 Patent, is brought about by the switching circuit, rather than by the adjustable voltage source at issue in this claim construction.  (*See id.*).

Based on the language in the claims and an exhaustive review of the specifications, the Court agrees with LD Tech that, for purposes of the aforementioned relevant claims, the voltages produced by the adjustable DC voltage source in the Asserted Patents should be construed to vary solely by magnitude.   This construction is supported by the language in the claims and specifications of the Asserted Patents.   As noted, the Asserted Patents explicitly separate references to the voltage produced by the adjustable DC voltage source from references to

14

duration and polarity, suggesting the "variable voltage terms" only include magnitude. (*See*, *e.g.*, '443 Patent, col. 12, ll. 3–6; *see also id.* at col. 2, ll. 63–65). Furthermore, the Abstract of the '443 Patent supports LD Tech's construction, explaining "[t]his system comprises . . . an adjustable DC voltage source for generating successive DC voltage pulses *varying in magnitude* from one pulse to another, the duration of the pulses being equal to or greater than about 0.2 seconds . . . ." ('443 Patent, Abstract (alterations and emphasis added)). The Court also agrees with LD Tech there is certainly no support in the patent text for construing the voltage variability terms to encompass turning the voltage source on or off. (*See* LD Tech Resp. 9).

Further, the voltage sources in all three Asserted Patents (*i.e.*, the respective Claim 1 of the '443, '954, and '170 Patents) should be construed as "sources that can be adjusted to vary the magnitude of voltage and duration of a voltage wave." As stated, the Asserted Patents clearly envisioned the voltage source to be adjustable by voltage magnitude. (*See*, *e.g.*, '443 Patent, Abstract). The text of the '443 Patent also indicates the user of the device may optionally adjust the duration of the voltage wave. (*See id.* at col. 5, ll. 6–8 ("The *duration of the waves*, which, at a minimum, is 0.2 second, and typically between 0.5 and 5 seconds, *is likewise optionally adjustable*." (emphases added))). However, because the plain language of the patents does not indicate the *voltage source* was designed to adjust polarity — even if polarity may be adjusted by other components of the device — the Court declines to include polarity in this construction. (*See id.* at col. 13, ll. 21–26 ("after having connected a certain pair of electrodes to the voltage source with a certain polarity, *the switching circuit* is designed to connect this same pair of electrodes to the voltage source with a reversed polarity" (emphasis added)); *see also* '170 Patent, col. 12, ll. 13–15 ("a direct current voltage source coupled to the computer, and *the computer causing polarity to switch* between the electrodes (emphasis added))).

15

**B. "High Impedance Electrodes"**

The parties dispute construction of the term "high impedance electrodes." The relevant

claims for this construction are as follows, with the disputed terms in bold and underlined:

> '443 Patent, Claim 1: "a switching circuit designed to selectively connect a pair of active electrodes to the voltage source, and **to connect at least one other high-impedance electrode**"

('443 Patent, col. 12, ll. 7–9).

> '443 Patent, Claim 4: "wherein when a pair of electrodes is connected to the voltage source, the switching circuit is designed **to connect all of the other high-impedance electrodes**"

(*Id.* at col. 12, ll. 30–33).

> '443 Patent, Claim 8: "wherein the measuring circuit is designed to measure the potentials on **all of the electrodes**"

(*Id.* at col. 12, ll. 47–49).

> '443 Patent, Claim 9: "an offset voltage-compensating circuit, which is designed to correct the measured voltages by correction voltages obtained by individually connecting each electrode to the voltage source, delivering a constant DC voltage, whereas **the other electrodes are connected in high impedance**, and by measuring the potentials on **the other electrodes**"

(*Id.* at col. 12, ll. 50–56).

> '443 Patent, Claim 19: "wherein the measured data is obtained from current values in the active electrodes and from potential values on **high-impedance electrodes**"

(*Id.* at col. 14, ll. 8–10).

> '443 Patent, Claim 22: "wherein the measurements are supplied by a measuring circuit designed to collect data representative of the current in the active electrodes and of the potential on **at least some electrodes connected in high impedance**"

(*Id.* at col. 14, ll. 22–26).

LD Tech proposes the term "high-impedance electrodes" be construed to mean "electrodes where the resistance [is] set high enough to prevent a significant amount of current from passing between the electrode and the patient's skin." (LD Tech Opening 12 (alteration added)). LD Tech argues this construction is consistent with the specifications of the '443 and '954 Patents. (*See id.* 13 (citing '443 Patent, col. 6, ll. 4–15 ("The measuring circuit 40 is capable of measuring . . . the voltages present on each of the 6 electrodes . . . . In this case, the extremely weak current which may be flowing in the electrodes Eb1 to Eb4 is ignored, the high-impedance connection of which is shown by the resistors Rb1 to Rb4 having a value typically greater than 10MΩ." (alterations added)))).[7] The '954 Patent similarly states the "two other passive [i.e., high-impedance] electrodes allow retrieval of the potential reached by the body." (*Id.* (quoting '954 Patent, col. 3, ll. 42–43 (alteration added))).

Impeto primarily takes issue with LD Tech's proposal that the insignificant current be located "between the skin and the electrode," arguing this precise location is not supported by evidence. (Impeto Resp. 4). Impeto proposes the term "high impedance" should be construed either under its plain and ordinary meaning, or alternatively, to mean "negligible current, substantially zero current, or having electrical resistor grounding." (Impeto Opening 24–25). Impeto argues this construction is supported by numerous parts of the '443 Patent specification. (*See id.* 25 (quoting '443 Patent, col. 4, ll. 32–33 ("in the presence of a negligible (high-impedance) current")); *see also id.* at col. 5, ll. 24–26 ("placing this terminal in high impedance, wherein in a conventional manner known per se, it can be seen as grounded by a very high ohmic value resistor"); *id.* at col. 7, ll. 16–17 ("through which a substantially zero current (high impedance) passes")). Impeto further argues the specification cited by LD Tech (*see* '443

---

[7] The numbers in the quotation from the '443 Patent specification refer to the diagram symbols in Figures 1 and 2.

Patent, col. 6, ll. 4–15), which discusses a high-impedance connection having a value typically greater than 10MΩ, is a non-limiting example.  (*See* Impeto Opening 25–26).

As LD Tech concedes, it appears the parties do not materially disagree with respect to this claim term.  (*See* LD Tech Resp. 16).  Both constructions acknowledge "high-impedance" means the current running through the electrode is insignificant or negligible (as opposed to the stronger current running through the active electrodes).  Thus, the parties' remaining dispute concerns the following two elements of LD's proposed construction: (1) whether the current should be construed specifically to pass "between the electrode and the patient's skin" (LD Tech Opening 12 (alteration added)); and (2) whether the "high-impedance" connection should be construed to have a high resistance value (*id.*).  With respect to the location of the connection being between the skin and the electrodes, there is insufficient support in the claims and specification of the '443 Patent to include this element in the construction.  Tellingly, LD Tech does not cite any patent language in support of this particular element.  (*See generally id.*; *see also* LD Tech Resp.).

With respect to the high resistance value of the "high-impedance" connection, the Court finds inclusion of this element appropriate.  First, as noted by LD Tech, the '443 Patent specification expressly discusses creating a high-impedance connection using high resistance values.  (*See* '443 Patent, col. 6, ll. 13–16 ("the high-impedance connection of which is shown by the resistors Rb1 to Rb4 having a value typically greater than 10MΩ")).  Second, both LD Tech and Impeto provided dictionary definitions of "impedance" that support including a discussion of resistance in the construction.  (*See*, *e.g.*, Impeto Opening, Ex. H[8] at 364 [ECF No. 37-9] (defining impedance as the "total opposition (i.e. resistance and reactance) a circuit offers to the flow of alternating current . . . ." (alteration added))).  Accordingly, the Court construes

---

[8] Exhibit H includes excerpts from Rudolf F. Grant, *Modern Dictionary of Electronics* (7th ed. 1999).

"high impedance" as "an insignificant or negligible amount of current caused by a high resistance value."

On a related point, the parties dispute construction of the term "the electrodes," as it appears in the following claims:

> '443 Patent, Claim 19: "receiving a set of data comprising measurements revealing electrochemical phenomena in the vicinity of **the electrodes** applied to skin of the patient at predetermined locations"

('443 Patent, col. 13, ll. 31–34).

> '170 Patent, Claim 1: "An electrophysiological analysis system for use on a patient, the system comprising: (a) a rigid right hand-electrode; (b) a rigid left-hand electrode; (c) a rigid right foot-electrode; (d) a rigid left foot-electrode; (e) a computer coupled to **the electrodes** . . . the computer causing polarity to switch between **the electrodes**; (g) the computer using analogue-to-digital conversion to assist with measurements from **the electrodes**"

('170 Patent, col. 11, ll. 20–32 (alteration added)).

> '170 Patent, Claim 4: "wherein all of **the electrodes** are of the same material and **the electrodes** operably carry out electrochemical measurements involving the chlorides"

(*Id.* at col. 11, ll. 46–48).

> '170 Patent, Claim 6: "related to electrochemical phenomena of the patient detected via the variations in the pH at **the electrodes**"

(*Id.* at col. 11, ll. 52–54).

> '170 Patent, Claim 9: "wherein the computer compares data detected by **the electrodes** in real-time with stored data previously obtained from the same patient"

(*Id.* at col. 11, ll. 62–64).

> '170 Patent, Claim 17: "the system comprising (a) a right hand-electrode . . . (b) a left hand-electrode . . . (c) a right foot-electrode  . . . (d) a rigid left foot-electrode . . . (e) a computer coupled to **the electrodes**; and (f) . . . the computer causing polarity to switch between **the electrodes**; (g) **the electrodes** operably sending signals to the computer . . . of the patient adjacent **the electrodes**; (h) the computer comparing data detected by **the electrodes**"

(*Id.* at col. 12, ll. 42–63 (alterations added)).

> '170 Patent, Claim 19: "wherein all of **the electrodes** are of the same material, and **the electrodes** are suitable for carrying out electrochemical measurements involving pH of the patient"

(*Id.* at col. 13, ll. 12–15).

> '954 Patent, Claim 1: "the voltage pulses lasting given durations allowing the stabilization of electrochemical phenomena in the body in the vicinity of **the electrodes**"

('954 Patent, col. 7, ll. 7–10).

> '954 Patent, Claim 5: "The method according to claim 1, wherein **the electrodes** include hands and feet electrodes"

(*Id.* at col. 7, ll. 31–32).

> '954 Patent, Claim 6: "The method according to claim 5, wherein **the electrodes** cover substantially all the surface of the hand palms and feet soles of the patient"

(*Id.* at col. 7, ll. 33–35).

LD Tech proposes these references to "the electrodes" be construed to include both "active electrodes" and "high-impedance electrodes." (LD Tech Opening 13). It relies on the same support for this construction as for the "high-impedance electrodes" construction. (*See id.*). Impeto asserts the plain and ordinary meaning of "the electrodes" should control, as this term does not suffer from any ambiguity. (*See* Impeto Resp. 5–6). In the alternative, Impeto proposes the term should be construed as "electrodes (regardless of the electrode's active, inactive, high impedance, or no impedance condition)." (*Id.* at 6). Impeto argues this construction is supported by the specification of the '954 Patent. (*See id.* (citing '954 Patent, Fig. 1 and col. 2, ll. 61–64 ("The system 100 comprises a series of large area electrodes 110, preferably four electrodes 110, on which the patient can place his hands and feet.")))[9] Impeto also asserts the prosecution

---

[9] The numbers in the quotation from the '954 specification refer to the diagram symbols in Fig. 1.

history of the Asserted Patents demonstrates the authors envisioned "the electrodes" in the '170 and '954 Patents to be construed more broadly than in the '443 Patent, in that the '443 Patent prosecution history explicitly discusses "high-impedance," while the histories of the other two patents do not.  (*See id.*).

The Court agrees with Impeto the term "the electrodes" does not suffer from any ambiguity and should be construed in its plain and ordinary meaning.  *See Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-CV-691-T-24-MAP, 2013 WL 2406267, at *7 (M.D. Fla. June 3, 2013) (finding a term "require[d] no construction because its plain and ordinary meaning [was] easily discernible from the claim language" (alterations added)).  The language of each individual claim provides sufficient context for the reader to determine whether the claim is referring to all of the electrodes, or a sub-set thereof.

### C.  "Measuring High Impedance Potential" Terms

The parties dispute whether the Asserted Patents should be construed to require the high-impedance electrodes to measure data, or simply to state the high-impedance electrodes are *capable* of measuring data.  The relevant claims for this construction are as follows, with the disputed terms in bold and underlined:

> '443 Patent, Claim 1, 22:[10] "a **measuring circuit designed to collect data** representative of current in the active electrodes and of the potentials **on at least some electrodes connected in high impedance**"

('443 Patent, col. 12, ll. 10–12; *id.* at col. 14, ll. 23–26).

> '443 Patent, Claim 8: "wherein the **measuring circuit is designed to measure the potentials on all of the electrodes**"

(*Id.* at col. 12, ll. 47–49).

---

[10] Claim 22 uses the terms "potential" rather than "potentials" and "the current" rather than "current." ('443 Patent, col. 14, ll. 23–26).

'443 Patent, Claim 9: "an offset voltage-compensating circuit, which is designed to correct the measured voltages by correction voltages obtained by individually connecting each electrode to the voltage source, delivering a constant DC voltage, whereas the other electrodes are connected in high impedance, and by **measuring the potentials on the other electrodes**"

(*Id.* at col. 12, ll. 51–56).

'443 Patent, Claim 19: "wherein the **measured data is obtained from** current values in the active electrodes and **from potential values on high-impedance electrodes**"

(*Id.* at col. 14, ll. 8–10).

'170 Patent, Claim 1: "**the computer using analogue-to-digital conversion to assist with measurements from the electrodes**"

('170 Patent, col. 11, ll. 31–32).

'170 Patent, Claim 17: "(g) **the electrodes operably sending signals** to the computer responsive to at least one of: electrochemical measurements involving chlorides or pH, of the patient adjacent the electrodes; (h) the computer comparing **data detected by the electrodes**"

(*Id.* at col. 12, ll. 59–63).

LD Tech proposes these terms be construed to require the high-impedance electrodes to measure data.  (*See* LD Tech Opening 13–14 (stating "the claims which recite limitations that include gathering data or making measurements 'of potentials on . . . electrodes connected in high impedance/all of the electrodes/the other electrodes' or which discuss gathering data at 'the electrodes' must include measurements/data gathered at high impedance electrodes" (alteration in original))).  It asserts this construction is supported by the specification of the '443 Patent, which notes the system measures electric potential at the high-impedance electrodes, even though the current flowing through these electrodes is insignificant.  (*See id.* 14 (citing, *e.g.*, '443 Patent, col. 7, ll. 4–6 ("the central unit . . . controls the measuring circuit 40 so as to record the potential present on each of the six electrodes" (alteration added)))).  LD Tech also argues the

'443 Patent prosecution history favors this construction, as there, the applicant contended the "potential of the high impedance electrodes is also very significant for the measurements" (*id.* (citing LD Tech Opening, Ex. 4 at 25–26 [ECF No. 38-4])), and this contention overcame an initial rejection by the Patent Office (*see id.*).

Impeto disagrees, asserting the terms should either be construed in their plain and ordinary meaning, or be construed so that the high-impedance electrodes are capable of measuring data, rather than required to measure data. (*See* Impeto Resp. 25 (proposing a construction in which a circuit is "*designed or capable* to collect data . . . on at least some of the electrodes of Claim 1(a), some of which are connected in high impedance . . . ." (emphasis and alterations added))). Impeto contends this construction is supported by the specification and the Abstract of the '443 Patent. (*See id.* 26). Impeto also argues the same section of the prosecution history cited by LD Tech supports its construction. (*See id.*).

The vast majority of these claims have plain, clear language, and suffer from no ambiguity. For example, Claim 1 of the '443 Patent clearly states the measuring circuit is designed to collect data "on at least some electrodes connected in high impedance." ('443 Patent, col. 12, ll. 10–12). It is unnecessary to construe such plainly worded claims. *See Indus. Eng'g*, 2013 WL 2406267, at *7. However, the Court finds it appropriate to construe one of the aforementioned claims so as to provide additional clarity. With respect to Claim 9 of the '443 Patent, the parties dispute whether "the other electrodes" refers to "any other[] of the electrodes of Claim 1(a)" (Impeto's position) or rather, high-impedance electrodes (LD Tech's position). (Impeto Resp., Ex. I at 16 [ECF No. 47-2] (alteration added)). The Court adopts LD Tech's construction here, because it is clear from the context of the claim "the other electrodes" refers to the high-impedance electrodes. ('443 Patent, col. 12, ll. 53–56 ("by individually connecting each

electrode to the voltage source, delivering a constant DC voltage, whereas *the other electrodes are connected in high impedance*, and by measuring the potentials on *the other electrodes*" (emphases added))).

**D.** "Reference Data" and "Comparison to Reference Data" Terms

The parties dispute whether "reference data" should be limited to data taken from "persons other than the patient," or if it may include data taken from the patient, *i.e.*, from multiple doctor visits. The relevant claims for this construction are as follows, with the disputed terms in bold and underlined:

> '443 Patent, Claim 2: "a processing device designed to analyze a reciprocal evolution of the current and the potentials based on the wave voltage, and to **compare the evolution with at least one reference evolution**"

('443 Patent, col. 12, ll. 22–26).

> '443 Patent, Claim 19: "accessing **at least one set of stored reference data comprising measurements revealing electrochemical phenomena, which were obtained under the same conditions, on patients identified as suffering or not suffering from this disease; and reconciling the set of data received with the sets of reference data, and, based on proximity criteria between the set of data received and the sets of reference data** identifying the patient as ill or not ill"

(*Id.* at col. 13, l. 35–col. 14, l. 7).

> '954 Patent, Claim 1: "**reconciling the data representative of the electrochemical skin conductance of the patient with reference data obtained in the same conditions on patients identified as suffering or not from autonomic neuropathy**"

('954 Patent, col. 7, ll. 17–20).

LD Tech proposes reference data/evolution be construed as "data representing measurements taken from persons other than the patient being measured — i.e. a database

against which newly measured data is compared." (LD Tech Opening 15).[11]  LD Tech asserts

this construction is consistent with the '443 and '954 Patent specifications. (*See id.* (citing, *e.g.*,

'443 Patent, col. 9, ll. 61–65) ("the method first consists in acquiring sets of multi-dimensional

data measured across a patient population for which the disease or diseases are known, and,

where relevant, with respect to patients already identified as healthy"); *see also* '954 Patent, col.

2, ll. 13–16 ("reconciling said data representative of the electrochemical skin conductance of the

patient with reference data obtained in the same conditions on patients identified as suffering or

not from autonomic neuropathy . . . ." (alteration added)))).

        In contrast, Impeto asserts the terms are well understood by one of ordinary skill in the

art and should carry their plain and ordinary meanings. (*See* Impeto Resp. 19, 21, 37).

Alternatively, Impeto proposes "reference data" be construed as data "whether from the same

patient, prior different patients, or any other source." (*Id.* 19). In the context of Claim 19 of the

'443 Patent, Impeto proposes "reference data" be construed as "including at least measurements

revealing . . . electrochemical phenomena . . . which were obtained under the same conditions

(including but not limited to age, weight, and/or sex), on multiple persons (which may include

the current patient and/or prior other patients) identified as suffering or not suffering from (e.g.,

having) this disease." (*Id.* 21 (alterations added)).

        Impeto asserts these constructions are consistent with the specifications of the '954 and

'443 Patents, relying on many of the same sections of the specifications as cited by LD Tech.

(*See id.* 20–21). Impeto argues the specifications and claims support a broad reading of

"reference data" to include multiple visits of the same patient and/or other patients (*see id.* 22),

relying on the following text from the specification of the '443 Patent: "Each set of multi-

---

[11] Likewise, LD Tech asserts limitations requiring the comparison of measured data to reference data should be construed to include its proposed definition of "reference data." (*See* LD Tech Opening 16).

dimensional data which was obtained with the above-described system, with respect to *patients being diagnosed, or else for whom a previous diagnosis requires confirmation or follow-up*, and which was completed by available additional data (also input or stored) . . . can then be reconciled with the set of reference data stored in association with the data processing unit" ('443 Patent, col. 10, ll. 21–30 (alterations and emphasis added)).[12]   Impeto also contends Claim 21 of the '443 Patent, which states the "method according to claim 19, wherein the data sets comprise *measurements taken on a patient* after a predetermined exertion by the patient," supports its proposed construction.  (Impeto Resp. 22 (quoting '443 Patent, col. 14, ll. 19–21 (emphasis added))).[13]

Based on the language in the claims and an exhaustive review of the specifications, the Court concludes the "reference data" terms should be construed to include "data, whether from the same patient or prior different patients."  This construction is supported by the specification of the '443 Patent, which envisions an ongoing iterative process in which reference data may be enriched over time by supplementing it with the results of now-current patients.  (*See* '443 Patent, col. 10, ll. 13–15 ("These sets of reference data can be advantageously enriched or refined from new acquisitions concerning afflicted patients, via iteration of the data mining process.")).  The Court is concerned construing the "reference data" terms as LD Tech proposes would interfere with the clearly envisioned purpose of the Patents to allow for supplementation of the reference data sets over time.

---

[12] This sentence of the specification is oddly drafted, as it purports to reconcile the "set of multi-dimensional data" with the "set of reference data," even though the specification earlier implied these two sets were one and the same.  ('443 Patent, col. 9, l. 61–col. 10, l. 10 (referring to how the method consists of acquiring sets of multi-dimensional data across a patient population and in "this way, a set of reference data is created")).

[13] The "data sets" in Claim 21 appear to refer to the "sets of reference data" in Claim 19 of the '443 Patent, given they are described in the plural as "sets" as opposed to the measured data "set," also referred to in Claim 19.  ('443 Patent, col. 14, ll. 4–21).

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

Yet, the Court does not adopt Impeto's construction in full.  There is no support in the text of the claims or specifications for the proposal that reference data may be obtained from "any other source," *i.e.*, a source that is not a current or previous patient.  The Court declines to construe the claims so broadly when there is insufficient textual support to do so.  Accordingly, the Court construes "reference data" solely as "data, whether from the same patient or prior different patients."

### E.  "pH/Chlorides" Terms

The parties dispute whether the system in the '170 Patent should be construed to measure and/or calculate pH and chloride values; or rather to measure electrochemical signals that depend upon pH or chloride concentration.  The relevant claims for this construction are as follows, with the disputed terms in bold and underlined:

> '170 Patent, Claim 1: "the computer operably determining if a patient disorder is present **using variation information regarding pH at at least one of the electrodes which is a cathode or using variation information regarding a concentration of chlorides at at least one of the electrodes which is an anode**"

('170 Patent, col. 11, ll. 35–39).

> '170 Patent, Claim 6: "The system of claim 1, further comprising **diagnostic measurement data, related to electrochemical phenomena of the patient detected via the variations in the pH at the electrodes**, is displayed on a display screen coupled to the computer"

(*Id.* at col. 11, ll. 51–55).

> '170 Patent, Claim 17: "**the electrodes operably sending signals to the computer responsive to at least one of: electrochemical measurements involving chlorides or pH**"

(*Id.* at col. 12, ll. 59–61).

> '170 Patent, Claim 19: "wherein all of the electrodes are of the same material, and the electrodes are suitable for carrying out **electrochemical measurements involving pH** of the patient"

(*Id.* at col. 13, ll. 12–15).

LD Tech proposes these claims be construed to require the system to measure or calculate pH and chloride values. (*See* LD Tech Opening 18; *see also id.*, Ex. 7 at 10 ("Exhibit 7") [ECF No. 38-7] (construing the above bolded language in '170 Patent, Claim 1 as "[u]sing information regarding variation in *measured or calculated values of pH or chlorides* at an electrode;" and construing the above bolded language in '170 Patent, Claim 6 as "[d]ata relating to *measured or calculated values of the variation of pH* at the electrodes is used to identify[] the presence of a disease in a patient from its signs and symptoms" (alterations and emphases added))). According to LD Tech, this construction is consistent with the specification of the '170 Patent. (*See id.* 19 (citing, *e.g.*, '170 Patent, col. 4, ll. 58–63 ("For example, *certain variations in pH* at the cathode, *which were detected by variations in resistance*, can reveal disorders of the acidosis and alkalosis type, whereas *certain variations in the concentration of chloride ions* at the anode can enable diagnosis of diseases such as cystic fibrosis." (emphases added)))). LD Tech also points to the prosecution history of the '170 Patent, arguing the Patent Office required the patent applicants to add the pH/chloride limitation to the current Claim 1 to overcome an objection to the original patent application. (*See id.* (citing *id.*, Ex. 5 at 28, 37–38 [ECF No. 38-5])).

Impeto insists these terms are not ambiguous, and the plain and ordinary meaning should control. (*See* Impeto Resp. 8). If the claims are to be construed, Impeto proposes the system be construed not to explicitly measure or calculate pH/chlorides, but rather to obtain and utilize electrical signals, or variations thereof, that relate to or depend upon pH or chloride concentration. (*See id.* 8–9 (proposing the pH/chloride language of Claim 1 be construed as "using information obtained from electrical signals or variations in electrical signals (*of any kind including but not being limited to measurements or calculated values*) that are *related and/or*

28

*dependent upon the pH* (or the concentration of Hydrogen H+ ions) in the vicinity of one or more

of the electrodes which is a cathode; or (ii) using information obtained from electrical signals or

variations in electrical signals (*of any kind including but not being limited to measurements or

calculated values*) that are *related and/or dependent upon the concentration of chlorides* (e.g.

Chlorine Cl- ions) in the vicinity of one of more electrodes which is an anode" (emphases

added))).

Impeto asserts the '170 Patent specification supports its proposed constructions, and cites

as evidence some of the same lines as LD Tech.  (*See id.* 9).  Impeto argues the section of the

specification that describes Figures 3A, 3B, and 3C of the '170 Patent indicates the claimed

language does not require a system that measures actual values of pH or chlorides (*e.g.*, a pH

value of six), as proposed by LD Tech, but rather takes measurements regarding or involving pH

and chlorides, such as relative values (*e.g.*, one pH or chloride value being greater than another,

and/or actual measured values).  (*See id.* 9–10 (citing '170 Patent, col. 8, ll. 3–64)).  Impeto also

relies on expert testimony for support.  (*See id.* 10 (citing Declaration of Dr. James F. Brennan . .

. ("Brennan Declaration") [ECF No. 47-3] ¶ 83 (stating:

> [A] person of ordinary skill in the art would have considered the claimed
> 'electrochemical measurements involving pH' to be of any electrochemical indication
> or signal directly or indirectly, in whole or in part, pertaining to or dependent upon pH,
> such as relative amounts (e.g., the current measurement is greater or less than a prior
> measurement), measured values of anything that varies in response to pH (e.g., an
> electrical signal value that is changed in response to but not actually the pH value), or
> the actual pH value.  Furthermore, it is clear from col. 8, lns 3–6 of the '170 patent that
> the term pH is being used in the context of quantifying the concentration of H+ ions,
> which would be understood by one of ordinary skill in the art to affect the electrical
> measurements by altering the conductivity of the patient's skin and/or sweat.

(alteration added)))).

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

Based on the language in the claims and an exhaustive review of the specifications, the Court agrees with LD Tech that as to the aforementioned relevant claims, the system in the '170 Patent should be construed to measure and/or calculate pH and chloride values.   This construction is supported by the '170 Patent specification, which specifically refers to the variations in the concentration of chloride ions as "measurements of chloride concentrations." ('170 Patent, col. 4, ll. 61–64 (stating "certain variations in the concentration of chloride ions at the anode can enable diagnosis of diseases such as cystic fibrosis.  *These measurements of chloride concentrations* . . . ." (emphases and alteration added))).

Further, the Court agrees that to read the aforementioned claims as not requiring the calculation or measurement of pH, chlorides, or variations thereof, is to effectively read the pH and chloride limitations out of the claims.   (*See* LD Opening 19); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950–51 (Fed. Cir. 2006) (holding "claims are interpreted with an eye toward giving effect to all terms in the claim[,]" in rejecting proposed claim construction because effect "would be to read limitations . . . out of the claim" (alterations added)).  Impeto's attempt to broaden the construction to include measurements "of any kind, such as but not being limited to relative values (e.g., one value being greater than another), or actual measured values[] involving, related to, or dependent upon, chlorides" (Impeto Resp., Ex. I at 5 [ECF No. 47-2]) fails to persuade.  From Impeto's definition, it would appear that a "relative value" essentially amounts to comparing the difference between two actual measured values.

 Because the claims relying on this construction vary considerably, they are addressed individually.  While the Court predominantly adopts the constructions proposed by LD Tech in accordance with the analysis above, the Court makes some minor variations to the constructions to preserve the plain meaning of the claims.  For Claim 1 of the '170 Patent, the Court construes

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

"using variation information regarding pH" as "using information regarding variation in measured or calculated values of pH;" and construes "using variation information regarding a concentration of chlorides" as "using information regarding variation in measured or calculated values of chlorides." ('170 Patent, col. 11, ll. 35–39). For Claim 6 of the '170 Patent, the Court construes "variations in the pH at the electrodes" to mean "variations in the measured or calculated values of pH at the electrodes." (*Id.* at col. 11, ll. 51–55). For Claim 17 of the '170 Patent, the Court construes "electrochemical measurements involving chlorides or pH" to mean "electrochemical measurements of chlorides or pH." (*Id.* at col. 12, ll. 59–61). For Claim 19 of the '170 Patent, the Court construes "electrochemical measurements involving pH" to mean "electrochemical measurements of pH." (*Id.* at col. 13, ll. 12–15).

### F.  **"Real-Time Comparison" Terms**

The parties dispute whether "real-time" should be construed as occurring simultaneously, or occurring within a patient session (3–15 minutes). The relevant claims for this construction are as follows, with the disputed terms in bold and underlined:

> '170 Patent, Claim 9: "wherein the computer **compares data detected by the electrodes in real-time with stored data previously obtained from the same patient** for monitoring the effect of a diabetes treatment"

('170 Patent, col. 11, ll. 62–65).

> '170 Patent, Claim 17: "the computer **comparing data detected by the electrodes in real-time from the patient with stored data previously obtained** to assist in detection of at least one patient illness comprising: (i) cystic fibrosis, or (ii) diabetes"

(*Id.* at col. 12, ll. 63–66).

LD Tech asserts these claim terms must be construed to mean the comparisons of measured data to stored data take place *simultaneously* with the measurement of the measured data. (*See* LD Tech Opening 19). At the *Markman* hearing, counsel for LD Tech pointed out the

'170 Patent specification refers to both "real time" and "quasi-real time" measurements, acknowledging the two are separate. ('170 Patent, col. 10, ll. 1–4 ("In the same way, a local or remote, real- or quasi-real time processing system can be combined with the present invention, according to the principles described, in particular, in the aforesaid document.")). LD Tech further notes if the comparison between measured data and stored data is not construed to occur simultaneously, the term "real time" is improperly rendered meaningless. (*See* LD Tech Opening 19–20).

Impeto explains "real-time" need not be construed so that the comparisons of measured data to stored data take place simultaneously. (*See* Impeto Resp. 17–18). Rather, Impeto asserts a person of ordinary skill in the art would not construe "real-time" to require simultaneous interpretation, given the entire context of the '170 Patent's specification and general knowledge of computer control in the medical device industry, but would instead construe "real-time" to be "within a patient session (e.g., within 3–15 minutes) or the like." (*Id.*; *see also* Brennan Decl. ¶ 66).

Impeto fails to provide any convincing evidence from the patent claims or specifications that "real-time" should be construed to mean "within a patient session (e.g., within 3–15 minutes) or the like." Further, its expert opinion essentially parrots, word-for-word, the text of Impeto's Response, and provides no additional helpful analysis. The Court agrees with LD Tech that Impeto's proposed construction would effectively read the limitation of "real time" out of the '170 Patent. (*See* LD Opening 19–20); *see also Bicon, Inc.*, 441 F.3d at 950–51; *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (rejecting district court's claim construction because it "effectively read[] the term 'free' out of the limitation" (alteration added)). Thus, the Court construes the term "real time" within the context of the two

aforementioned '170 claims as meaning "the comparisons of stored data and data detected by the electrodes occurs simultaneously with the detection of data by the electrodes."[14]

### G.   "Offset Voltage-Compensating Circuit"

The parties dispute whether the "offset voltage-compensating circuit" should be construed (1) as capable of applying correction voltages *to the measuring circuit*; and (2) as physically separate from the switching circuit and the measuring circuit.  The relevant claim for this construction is as follows, with the disputed terms in bold and underlined:

> '443 Patent, Claim 9: "**an offset voltage-compensating circuit, which is designed to correct the measured voltages by correction voltages** obtained by individually connecting each electrode to the voltage source, delivering a constant DC voltage"

('443 Patent, col. 12, ll. 50–54).

LD Tech proposes the "offset voltage compensating circuit" be construed to require that the circuit be capable of applying correction voltages to the measuring circuit.  (*See* LD Tech Opening 17).  LD Tech asserts this construction is supported by the '443 Patent specification. (*See id.* (citing '443 Patent, col. 9, ll. 21–25 ("each time that a given electrode is selected as an anode, the offset voltages recorded when this same electrode was connected to the voltage source are used to correct the voltages recorded at the other electrodes by the measuring circuit"))).  LD Tech also asserts the "offset voltage compensating circuit" is defined as being separate from the "switching circuit" and the "measuring circuit;" however, its only support for this contention appears to be that the circuits are described in different claims.  (*See id.* 17–18).

Impeto contends the "offset voltage-compensating circuit" is well understood by a person of ordinary skill in the art and should carry its plain and ordinary meaning.  (*See* Impeto Resp. 35).  Alternatively, Impeto proposes the term be construed not "to require this circuit to act upon

---

[14] The Court uses the term "data detected by the electrodes" instead of "measured data" (proposed by LD Tech) because it more closely follows the exact wording of the '170 Patent claims.

the measuring circuit itself but instead [to] be capable of correcting a measured voltage received or flowing to or from any component or circuit, which may include the measuring circuit." (*Id.* 36 (alteration added)).  Impeto asserts this construction is consistent with the circuit diagram and text of the '443 Patent.  (*See id.*).  Impeto also argues the term should be construed so that the offset voltage-compensating circuit may be "part of a larger circuit," *e.g.*, not necessarily separate from the switching or measurement circuits.  (*Id.* 35).  It contends this construction is supported by the '443 Patent specification and by a technical dictionary's definition of "circuit." (*See id.* 36).

Based on the language in the claims and an exhaustive review of the specifications, the Court agrees with Impeto the terms, as written, do not suffer from any ambiguity and should carry their plain and ordinary meaning.  *See Indus. Eng'g & Dev., Inc.*, 2013 WL 2406267, at *7. This conclusion is consistent with the Court's decision at the *Markman* hearing to likewise construe "calibration circuit" under its plain and ordinary meaning, as the parties raised similar issues concerning that term.  The plain language clearly states the purpose and configuration of the offset voltage-compensating circuit (*see* '443 Patent, col. 12, ll. 50–54); and the Court declines to read in any additional limitations proposed by the parties, particularly where, as here, the '443 Patent specification provides very limited guidance.

### H.  "Electrode Pair" Terms

The parties dispute whether the "electrode pair" limitations in the '443 Patent require each of two electrodes to be connected to the voltage source; and whether "a pair of electrodes" in Claim 4 refers to a separate pair of electrodes than the active pair referred to in Claim 1.  The relevant claims for this construction are as follows, with the disputed terms in bold and underlined:

'443 Patent, Claim 1: "**a switching circuit designed to selectively connect a pair of active electrodes to the voltage source**, and to connect at least one other high-impedance electrode"

('443 Patent, col. 12, ll. 7–9).

'443 Patent, Claim 3: "The system according to claim 1, wherein the switching circuit is designed to **successively connect various pairs of active electrodes of the voltage source**"

(*Id.* at col. 12, ll. 27–29).

'443 Patent, Claim 4: "The system according to claim 3, wherein when **a pair of electrodes is connected to the voltage source**, the switching circuit is designed to connect all of the other high-impedance electrodes"

(*Id.* at col. 12, ll. 30–33).

LD Tech proposes these electrode pair limitations be construed to require "each of the two electrodes in the electrode pair be connected to the voltage source." (LD Tech Opening 12). LD Tech asserts this construction is supported by the plain language of the claims. (*See id.*). It also contends the prosecution history of the '170 Patent supports this construction, as there, Impeto drafted a claim having an "active electrode and a passive electrode;" but Impeto included no such language in the '443 Patent claims. (*Id.*).

Further, LD Tech proposes "a pair of electrodes" described in Claim 4 of the '443 Patent be construed as: "Two other electrodes . . . connected to the voltage *source separate and apart from the two active electrodes*" (Ex. 7 at 3 (alteration and emphasis added)). At the *Markman* hearing, LD Tech explained its support for this construction is that the indefinite article "a" before "pair of electrodes" suggests this pair of electrodes is separate from the "active" pair of electrodes referred to in Claim 1. However, LD Tech could not point to any other language in the Patent claims or specification corroborating this separation.

35

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

Impeto proposes construing "a pair of active electrodes" to be a subset of "a series of electrodes" from Claim 1 of the '443 Patent; for example, "an associated cathode and anode, which form an electrical pair when a measurement is taken, from the total quantity of previously introduced electrodes." (Impeto Resp. 24). With respect to the electrode pair terms described in Claims 3 and 4, Impeto proposes these terms are well understood by one of ordinary skill in the art and should carry their plain and ordinary meanings. (*See id.* 31, 33). It also proposes alternative constructions in the event the Court does not adopt the plain and ordinary meaning. (*See id.* 31–33).

The electrode pair terms in the '443 Patent suffer from no ambiguity and should be construed in their plain and ordinary meaning. While the terms in Claim 4 are slightly less clear than the terms in Claims 1 and 3, there is inadequate evidence in the record to construe them in the manner proposed by LD Tech. Thus, the Court concludes the most prudent option at this point is to construe all terms in their plain and ordinary meaning.

**I. "Reciprocal Evolution"**

The parties dispute whether "reciprocal evolution" is an indefinite term, and therefore invalid. The relevant claim for this construction is as follows, with the disputed term in bold and underlined:

> '443 Patent, Claim 2: "The system according to claim 1, further comprising a processing device designed to analyze a **reciprocal evolution** of the current and the potentials based on the wave voltage, and to compare the evolution with at least one reference evolution"

('443 Patent, col. 12, ll. 22–26).

LD Tech asserts "reciprocal evolution" is indefinite because it "fails to inform with reasonable certainty the scope of the invention claimed in claim 2 of the '443 Patent, when read in light of the specification and prosecution history to persons of skill in the art." (LD Opening

15 (citing *Nautilus*, 134 S. Ct. at 2124)).  LD Tech avers the '443 Patent neither defines the term

"reciprocal evolution," nor even suggests what the term might mean.  (*See id.* 14).   It contends

the only support for this claim language is in the Summary of the '443 Patent, and this summary

merely parrots the claim language.  (*See id.* (citing '443 Patent, col. 2, ll. 36–40)).   Thus, LD

asserts "reciprocal evolution" is an invalid patent term.  (*See id.* 15).

Impeto argues the term "reciprocal evolution" should carry its plain and ordinary

meaning; or, in the alternative, proposes it should be construed as meaning "mutual or shared

relationships for a group of changeable values or data[,] of the electrical current and the

potentials (i.e., voltage differences) based on the wave or event voltage . . . ."  (Impeto Resp. 28

(alterations added)).   In support, Impeto contends the description of the measurement procedure

and associated data processing steps given in columns 8 and 9 of the '443 Patent clearly explain

"reciprocal evolution of the current and the potentials based on the wave voltage" refers to

changes in the relationship between the measured current and various potential differences

throughout the system as a function of the applied DC voltages.  (*Id.*).   For example, Figure 3B

of the '443 Patent is described as depicting "curves [that] show the *mutual evolution* of the

cathode voltage (i.e., of current I), appearing on the y-axis, and of the various potential

differences . . . , the voltage appearing on the x-axis."  ('443 Patent, col. 8, ll. 21-24 (alterations

and emphasis added)).

Impeto also points out the wording of Claim 2 itself, noting the Claim states "reciprocal

evolution of *the current* and *the potentials* based on the wave voltage," which, when considered

in its entirety, clearly refers to a mutual interdependence of the current and the potentials.

(Impeto Resp. 29; *see also* '443 Patent, col. 12, ll. 23–24 (emphases added)).   Furthermore,

Impeto contends extrinsic dictionary definitions support its proposed construction.  (*See id.*).   In

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

particular, it quotes the online Merriam-Webster Dictionary's definition of "reciprocal," which states "shared, felt, or shown by both sides" and "mutually corresponding." (*Id.* (quoting *id.*, Ex. 1 at 34–35 [ECF No. 47-4])).

The text of the '443 Patent specification and of Claim 2 itself sufficiently inform "with reasonable certainty, those skilled in the art about the scope of the invention," *Nautilus*, 134 S. Ct. at 2124; thus, "reciprocal evolution" is not invalid for indefiniteness. Both the '443 Patent specification and the text of Claim 2 indicate "reciprocal evolution" is essentially another term for "mutual evolution" ('443 Patent, col. 8, ll. 21–24), and refer to the interdependent development of the "current in the active electrodes and of the potentials on at least some electrodes connected in high impedance" (*id.* at col. 12, ll. 10–26). This construction is supported by the description of Figure 3B in the specification (*see id.* at col. 8, ll. 21–27), as well as by the extrinsic dictionary evidence cited by Impeto.

LD Tech has not met its burden of showing "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the [term, "reciprocal evolution"] based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton*, 514 F.3d at 1249–50 (alteration added); *see also Freeny,* 2014 WL 4294505, at *4 ("Indefiniteness is a legal determination; if the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite."). Further, the Court adopts Impeto's proposed construction[15] of "reciprocal evolution" as "mutual or shared relationships for a group of changeable values or data[,] of the electrical current and the potentials (i.e., voltage differences) based on the wave []

---

[15] The Court slightly alters Impeto's proposed construction to maintain the original meaning of the claim language.

CASE NO. 15-20109-CIV-ALTONAGA/O'Sullivan

voltage" (Impeto Resp. 28 (alterations added)), finding it supported by the intrinsic and extrinsic evidence, as established *supra*.

### IV.    CONCLUSION

The claims, terms, and phrases of the Asserted Patents are construed as set forth above. Any claim language not explicitly addressed in this Order shall be construed in its plain and ordinary meaning.

**DONE AND ORDERED** in Miami, Florida, this 6th day of January, 2016.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record